The Honorable Judges of the United States Court of Appeals for the Tenth Circuit. Hear ye, hear ye, hear ye. The United States Court of Appeals for the Tenth Circuit is now in session. All those having business before this Honorable Court may now draw near, and they will be heard. God save the United States and this Honorable Court. Please be seated. Good morning. We have only one case scheduled this morning for argument. And I see counsel are ready. We will hear arguments in the case of Grissom v. Royal. We'll hear from the appellant. May it please the Court. My name is Tom Hurd. I represent the appellant, Wendell Grissom, and this is my co-counsel, Patty Gessie. I want to thank the Court right off the bat for being here and sitting in Oklahoma City, and especially in the heatwave we're having. It's about mountains in Long Island, and I thought we'd just come to the mountain. We've known about the importance of the brain and the importance of brain damage for a long time now. Look at the red flags for brain damage in this case. We had neurological insults, including a loss of oxygen at birth, markedly poor speech development as a child, at least three severe head injuries, chronic long-term alcohol abuse. Now, respondent responds by saying, hey, they had two experts, and besides Dr. Dunn, the psychiatrist. Our response to that is that it's not about numbers or labels. So would it be your argument, counsel, that you have to start with some type of neurological psychiatrist? I mean, what is the highest level that you can get to when you're analyzing difficulties with the brain? And do you have to have that person as your expert at trial, always? It's not so much the label, but it's the knowledge, for starters, of the trial counsel. The ABA standards hold capital trial laws to a very high standard. They have to know these things. They have to know, I spoke about it in our brief and in our 28J, the importance of the neuro side of things, the brain side of things, how important it is to get a neurological examination. The lawyer has to know about this, and in the Wilson case, this court said, counsel may not simply hire an expert and then abandon all further responsibility. So it's not just hiring someone, it's how they use them. In this case, the proof is in the pudding. If you look at Dr. Dunn's testimony, he doesn't mention the brain, he doesn't mention neuro, you don't see any of that. Look at his report, the same thing. The brain is omitted. But the behavior of the defendant was brought out and described by both of the experts, right? Right, behavior. But as this court has said over and over again, brain damage is particularly important. But, Mr. Herbert, let me question you about that. Now, the court has said that, that the brain is particularly important. And in, for example, in Little John 1, the panel did particularly enunciate that. But it was always, and you mentioned Wilson. Wilson is another example. Wilson, Sears, all of these cases have differentiated between a case in which you have unused evidence of organic brain damage that was not used, and you had, as Graham v. Royal put it, a good guy defense that was actually put on in the mitigation phase at trial. Here we have a situation where I don't think we have addressed yet, and that is you do have, as Judge Briscoe put it, you have evidence involving the very manifestations of what you would have Dr. McGarren talk about, and that is behavior that manifested itself from organic brain injury. And that was used. The behavior was used. And we have never, even on de novo review, have concluded that there was a constitutional violation, ineffective assistance, by failing to use organic brain injury when the manifestations of organic brain injury were actually exploited at trial in the mitigation phase. My response to that would be that that's asking jurors to be experts. Jurors don't have to know the red flags for brain damage. They shouldn't be expected to know the red flags for brain damage, but trial counsel does have to know these things under the standards. His performance was deficient because of that, and our case law has long held just because there's some mitigation in a case, that's not enough. There's red flags for brain damage, and counsel has to follow up on that. What difference would it make? As I understand it, Dr. McGarren would have testified that organic brain injury would have manifested itself in a lack of organization, reasoning, memory, and planning. None of those involve something like the panel addressing in Littleton 1, where something would have caused, for example, the defendant to have acted impulsively, or in another case, I think in Wilson, to exercise a lack of judgment. The arguments that you have made in your two briefs have said that this was essentially a botched, intended burglary, shooting, that it was ridiculous the way that the petitioner had tried to escape with Mr. Johns on a four-wheeler ATV, but none of those go to why he decided to try to kill somebody, why he decided to do this in the first place. It was all the execution of the shooting, rather than the decision to actually go and commit this murder. My response to that would be that it shows spectacularly poor and brain-damaged reasoning in his head, and a case that does speak to that that I think is similar in several respects is the Anderson case. It's the same type of brain damage that's talked about, frontal lobes, poor reasoning, poor judgment. Well, don't we look at all of the conduct that preceded these crimes, and even the conduct occurring at the crime scene and the conduct following the crime? I mean, this was planned. Organization occurred. They bought gloves. They looked for a remote home. They found a home where people were present. It was obvious that he thought he would be shooting people, telling his cohort, don't come in until the shooting's over. I mean, this is not an impulsive activity. Unfortunately, the impulsivity aspect of this did not come in until later in our heinous experts. But impulsivity is not the only thing that matters in a brain-damaged case. And another way to look at what happened is it makes no sense for them to look for a house with people in it. Nothing makes – Well, counsel, most crimes make no sense. I mean, truly. Particularly, absolutely no sense at all. And other aspects of the case, you know, they're so – he's so drunk that they're out in the middle of nowhere. People see him right off the bat and report him. Well, but they didn't report him. I mean, I think that's a little misleading because they didn't report him because they thought he was drunk. They reported him because he had Arkansas license plates that they thought were out of place. He looked suspicious. Right. So it had nothing to do with his level of intoxication. And, you know, I watched his video, and I can't say that watching it makes me think that he was so intoxicated that he couldn't form a specific intent, which is, I think, what you're arguing. Going back for a minute to the brain damage, I don't see anywhere in the record that there's evidence that trial counsel was aware of the incident while he was incarcerated where Mr. Grissom passed out and was aware of the medical records related to that. Right. And that's not before the state court. We could only ever get to that if we got past – Would it affect your view of ineffective assistance if that was never made known to trial counsel? The fainting, the think-a-pole episode in the jail? Yes. That Dr. McCarrahan relies on to then follow through to come to her dementia diagnosis. I think Dr. Heyman, our neuroradiologist, relies on it, and we get the CT reports and all that at the habeas level. But Dr. McCarrahan, she uses essentially what was available at the state court stage. Let me ask you this. In Littlejohn, we talked about that you have to look at the specific evidence of brain defect and the facts of the case and whether that specific defect really has anything to do with explaining why the defendant did what the defendant did. Here, as in Littlejohn, you have a diagnosis of a very common condition, dementia. I really don't see a link particularly between explaining to the jury why Mr. Grissom did what he did and a diagnosis of dementia that is very common. I have a couple of responses to that. One is that experts, diagnosticians, they like to diagnose. They get a diagnosis of dementia. But what really is important here in this court and the Supreme Court has talked about is the physical alteration of brain structure, the brain damage. And what this brain damage evidence does, it helps explain so many things. It explains in a general way Mr. Grissom's life trajectory, his downward spiral. In Littlejohn, they talked about the life of deviance in this kind of general explanatory sense. But it also explains the crime here. It's extremely poor reasoning and a huge amount of alcohol together. You can see in every step of the way this crime. It helps explain what happened, how he got to this point in his life and how the crime happened. To speak to your question about watching the video, the state says he was very lucid. He was extremely lucid. We say he was drunk as a skunk. Look at all these ways he doesn't know what's in his head. He doesn't know what's in his mind. He can't remember this. And if he says, well, the next thing I remember, the next thing I knew, there's two very different views. But that's where an evidentiary hearing comes in so important. An evidentiary hearing is needed in this case. But we can only get to an evidentiary hearing. And I think you essentially acknowledged this in your briefs, but tell me if not, that under Cullen versus Penholster, we only get to an evidentiary hearing on the issue involving organic brain damage if you can surpass 2254 D1 or D2, correct? Right. And as we argued, which I can speak to, the deficient performance problem, I believe, is de novo reviewed. Why? Because the OCAS analysis is all about prejudice. Well, let me ask you that. The OCCA's opinion, as I recall it, and I'm not purporting to quote it because I don't have it in front of me there, my regulation is that the OCCA said that the Petitioner had failed to show that counsel was ineffective, never differentiated between prong one and prong two. And under part three of the Supreme Court's opinion in Primo versus Moore, I think Justice Kennedy was very explicit in saying that if the state appellate court does not identify which prong a Strickland claim is rejected on, then the state appeals court's opinion is subjected to deferential review under AEDPA on both Strickland prongs. Do you remember? I mean, nobody cited Primo versus Moore, but do you recall it? The way I would explain the OCCA's opinion is it starts out by saying he's not shown he's ineffective. And here's all the reasons there's no prejudice. And when they're saying he hasn't shown he's ineffective, that could be, you know, when the statement is made, counsel is not ineffective. That could be because his performance wasn't deficient or because there's no prejudice. So it's ambiguous. So is that right? Well, that's the conclusion. But all the items, all the factual statements, all the analysis is all about prejudice. Well, let me ask you this. I'm trying to interrogate you and try to understand it. Sure. Did the OCCA identify which prong? Now, one can make an argument, as you just did, that the OCCA must have internally been thinking about prong two. But is it fair to say that the OCCA never explicitly said whether it was prong one or prong two that they were relying on? It didn't. There isn't a statement. When we skip the deficient prong and go straight to prejudice, they didn't make that statement. But all the analysis. But does it matter? I mean, you have to have both. You don't have to have that statement, though. True. But you have to have both. To have ineffective assistance under Strickland, there must be both proof of deficient performance and prejudice caused. Right. So if they cut to the chase and say no prejudice, game over, right? Well, that's what, I mean, the Supreme Court says if you want to just look at one prong, that's fine. And what we say is if you're going to skip one of the prongs, don't expect to have deference. Don't expect to have deference on the prong that you skip. But the deference is to the conclusion that counsel was not ineffective. Isn't that what we're looking at? Yes. But, I mean, Wiggins and Marpilla say what they say. In every case, you know, if a court decides that there's no ineffectiveness, they've ruled on both prongs. Well, but the Supreme Court has said, as Judge Bacrat pointed out, that unless the state court expressly indicates that it's skipping a prong, then we assume that they've ruled on both prongs, on the merits, and it gets deference under AEDPA, correct? I don't want to belabor the point. I just feel if they didn't, you know, it's not too much to ask, but have at least one iteration, one statement about deficient performance. About the getting overhead on the IAC, brain damage IAC, what the OCA said is, and I think the real problem with the OCA's decision is they were presented with evidence of severe brain damage, and they just said that they thought it was equivocal slash dubious. When there was no contrary evidence at all. Can I, before, well, as you get into this issue, can you help me, I want to make sure that I understand the catalog of all of your arguments, whether it's the deficiency prong or the prejudice prong on this organic brain injury. My understanding of your two arguments were that the OCCA was unreasonable in part of what you just said, that the reference to Dr. McGarrett-Hann's report was equivocal, and the sentence before that, that it was largely cumulative with the evidence that was elicited from Dr. Dunn and Dr. Halt. Are those your only two arguments? I don't mean that pejoratively, but is there anything else that you have argued that would allow you to get past 2254D on the organic brain injury? Those were the only two that I saw, because the reason I ask you that is in your brief, my recollection is that you proceeded to criticize Judge DeGiusti's opinion, the district court's ruling, but as far as the OCCA and AEDPA, those were the only two arguments that I thought you were relying on. Is that, I'm trying to track you. I'm sorry, I got distracted by whether it was Judge DeGiusti or not. Okay, sorry. My only questions are, are those your only two arguments to get past AEDPA on the organic brain injury, the two references to it being cumulative with Theresa Hall and Dr. Dunn, and whether Dr. McGarrett-Hann's report was equivocal? What I started out the whole argument about is the case law being so clear about brain damage being different, brain damage being so important, the physical alteration of the brain being so important. I mean, that's- But what does that have to do with 2254D? How does that fit in with getting past AEDPA? Discounting the brain damage in this case is an unreasonable application of the case law. And even if we were to agree with you on deficient conduct, as Judge Briscoe pointed out, you'd have to also show that it was prejudicial. And if you look at Little John, you look at Grant on B-Royal, the recent decision, just because it's a brain defect doesn't spot you prejudice. And you have to look specifically at the condition and whether it's reasonable or it was unreasonable for the OCCA to conclude it wouldn't have made any difference. Right. And comparing this case to Little John, for example, Little John 2, as it turned out, it was garden variety brain damage. It was microscopic as far as the physical alterations. And brain damage evidence was on the verge of life support. Here, the state court was presented with evidence that it was severe, that it was significant. Well, Little John, in your brief, you suggest, maybe it was your 28-J, that it was weak evidence of a brain defect. But that's not what the case says. It says that the impact of the evidence of the brain defect was weak. So I don't read it as saying that the brain defect evidence was weak. It's saying that the impact of that was weak. And I think, to some extent, we have the same thing here. Judge Briscoe pointed out, if what you're saying is he had dementia and he couldn't plan, well, he planned well enough to point his car with the nose facing out for a quick getaway. He planned well enough to practice shooting the gun and loading it ahead of time, buying the gloves. And, you know, so you have to connect those to show prejudice, don't you? It's the concrete reasoning more than the planning. And you can look at all the extremely stupid and drunken things he did as well. But the reason why the impact was weak in Little John is because the brain damage was weak. It was, you know, ADHD, which everybody has. And the brain damage was microscopic. Microscopic. Here it's severe. Temporal lobes. The frontal lobes. Can I ask you a question? Let's say we're not talking about organic brain injury, but we're talking about someone who had, let's say an infant, and has two parents that are addicted to drugs and they had spent their lives in prison. And they had a horrific childhood. There's no physical injury to their brain, but that this infant grew up without the advantages, for example, that I had, or that most of us in this courtroom have had, and that that would go a long way toward explaining why there should be some extra sympathy that was accorded to this individual. Is that qualitatively different than the kind of organic brain injury as an explanatory factor for this case? I mean, what would differentiate those two cases? I got Judge Holmes in Little John I and II, and II does not back away from Little John I. In Little John I, all Judge Holmes said was that under pre-ed standards, there should be an evidentiary hearing. He didn't say that there was a deficiency. Which is where we're headed in this case. But in Little John I, it was de novo review, right? That's correct. Huge difference. But the concept of brain damage being different, the structural alteration of the brain, jurors are going to react to that. It's not the mitigating power of knowing that the person's brain has been physically damaged. It's something better and different. And that's what your court precedent holds. Do you want to talk about the other issue? Well, I guess I might really quick because I'm running short on time. Where I like to go on that is the ineffectiveness of the counsel. To me, it has this clean path. There's less obstacles. And first, just real quick on deficient performance. You know, just imagine how different it would be to have counsel had actually known the law. It could have made a huge difference. Remember that this. We can consider that a Cullen versus Finholster unless you get past it. Right. What they said is not in the OCC. I see ineffectiveness of the counsel. I'm constantly comparing it to Brady for some reason. But if you analogize it, you go back and look at the trial that was. What would have been different if the Brady evidence had been there or if the attorney actually knew the law? How would it have been different? And here, you know, it would have been very different. We would have had intoxication. We would have had lesser included instructions. Well, but you have here repeated admissions by counsel on behalf of the defendant that this was premeditated murder, folks. And we're not even going to talk about guilt because we admit guilt. Why in the world, then, would the attorney then seek lesser included instructions? That's kind of the whole deal here. If counsel would have been. He shouldn't he shouldn't have admitted guilt. Well, you know, he that's not an issue. He saw the light at some point and he argued intoxication. And he actually he argued a little. So, well, if he'd have been effective, it would have been much different. I want to preserve the rest of our. OK. Thank you. May it please the court. Jennifer Crabb on behalf of the appellee. You might pull the mic closer to you. There you go. Thank you. This court has identified two ways in which organic brain damage evidence is is most persuasive to juries. That being one, whether it explains the crime. That's probably the most important thing. And to being whether it's treatable and therefore doesn't contribute to a finding of continuing threat. This case is very similar to the grant the royal case that this court court decided recently. In that case, the expert found frontal lobe damage and said that it impaired grantability to think logically, adaptively and coherently. Which sounds to me very similar to what we have here. Deficit and memory, planning, reasoning and organization. And this court said that what the expert didn't say is that there was impulsivity or aggressiveness caused by this brain damage that would have meaningfully explained the crime. And we have the same we have the same thing here. Nothing about this brain damage evidence explained as Judge Briscoe asked why Wendell Grissom decided to go kill people that day. Go ahead. Are you it sounds as if you were jumping over deficient conduct and going right to prejudice. Is that what you're doing in your argument? I am, Your Honor. And I by no means am conceding deficient performance. And I'm happy to talk about that. I just think that the strongest point in this case is looking at this court's prior cases on what causes what might get released for organic brain damage evidence. And we don't have that here. The expert in Grand vs. Royal and remind me because I think you just mentioned mentioned it. My recollection was that one difference between the expert in Grand vs. Royal and in our case in Dr. McGarrahan's report was the reasoning in Grand vs. Royal. The neuropsychologist didn't testify. Is this correct that the organic brain injury would affect the ability to reason? Well, to think logically, which I don't know if there's a distinction between those two things or not. They seem very similar to me. And it didn't explain the murder. And here, even the ability, A, I would take great issue with his alleged lack of ability to reason. But, B, even if that were the case, Dr. McGarrahan does not connect that to the decision to drive to an isolated residence where he knows people are home and tell Jesse Johns. He said in his second interview with police that, I told Jesse all that I would do. Why didn't he ask to get out of the car? Why didn't he stop? And then he tells him he's going in to wait until the shooting stops. And nothing about Dr. McGarrahan's report in any way explains that. Well, let me also ask you about another difference with Grant. In Grant, the jury during the penalty phase heard evidence that Mr. Grant suffered from schizophrenia, which is a pretty significant mental illness. Here, there was no similar evidence that came in with the jury. Do you think that's a difference in Grant in evaluating the prejudice of leaving out the brain defect evidence? No, Your Honor, because I think while Mr. Grissom was not diagnosed with brain damage, he was diagnosed with depression. The jury heard a lot of evidence about his mental state. They knew all of the ñ in Grant, what the court said was that the red flags were presented to the jury as such. They were here as well. The jury knew about the lack of oxygen at birth. They knew about the speech difficulties, all of the head injuries. They were told that after his last head injury that he was unable to return to school, that he was supposed to be following up for neurological treatment, but that he did not get that because his family moved. And so while he wasn't diagnosed with schizophrenia, he was diagnosed with a mental illness, and the jury was aware of all of the red flags and also of the fact that this was causing him headaches, changed who he was, all of those things. You said the jury was aware that he had a mental illness? Yes, depression, Your Honor. Depression. Yes. Okay. And they were instructed as to those mental health defects. And then as to treatability in this case, Dr. Hall, who was testified at trial, performed a risk assessment. She looked at petitioners prior to incarceration and at the time that he spent in jail awaiting trial for these crimes, and she said that he was a very low risk. I think she put it at about 4 to 5 percent. But then Dr. McGarrihan offered no opinion that Wendell Grissom would do well in a structured setting. In fact, all she said was that he has permanent brain damage and that it would be deteriorating at a rate higher than his peers. So in contrast to what trial counsel did, which was try to rebut the continuing threat aggravator by saying, if you put him in prison, everybody's going to be safe. He's going to behave himself. Counsel now wishes that trial counsel would have told the jury that he had permanent and deteriorating brain damage, which this court, as I said before, treatability is one of the keys that this court has looked at. So we don't have either of those here. Again, isn't treatability – I mean, you're looking at treatability for the continuing threat aggravator. And when the condition is dementia, does treatability really factor in as much as if you have a brain defect like lack of impulse control that you had in little John, where somebody might more likely be a continuing threat? I mean, does the importance of treatability change with the specific diagnosis we're looking at? I think, for one thing, what your question goes to, it just further points out the weakness of the explanatory power of this evidence. But the answer to that question is, if it had been presented to the jury that his brain damage is the reason that he committed these crimes, it's what made him make these violent choices, then I do think that the lack of treatability would be just as important in this case. Thank you. If I could move on to Proposition 2. Does the court have any further questions on Proposition 1? I think all three of the sub-propositions in this proposition all boil down to whether Petitioner had the intent to kill. The voluntary intoxication instruction was only appropriate if he could not form the intent to kill. The lesser instructions were only appropriate if a rational jury could conclude that he lacked the intent to kill. And then the prejudice for ineffective assistance would hinge on that factor. And I would point this court to the case of Thornburg, in which we had a similar argument, which was that counsel was ineffective for not requesting voluntary intoxication instructions, and in so doing, forcing the trial court to give lesser offense instructions. And this court said that it could not find prejudice, and this was on de novo review, because even though the jury had what this court called, quote, a barrage of evidence of intoxication, they nevertheless weren't properly instructed on, they were not instructed on voluntary intoxication, but they were instructed on the elements of murder in the first degree, which require malice, and they found malice. Therefore, there was no prejudice. In this case, there can be just absolutely no question about Petitioner's intent to kill. I've already outlined some of the facts here, but all of the planning that led up to it, the things that he said to Jesse Johns, and then Mrs. Cupp said, you can have whatever you want. But he went ahead and shot her, and he went ahead and shot Amber Matthews, and Amber Matthews was standing against the wall. The gunshot wound entered behind her ear and exited out the front and then went through the window, because her hair was in the bullet hole in the window, so she must have been facing away from him, and this was a close-range shot, so he walked up to her and shot her in the head at close range, and then after she fell on the floor, he shot her again in the forehead. And this Court has repeatedly looked at that factor, the choice of where to inflict wounds. You did in John Grant with stabbing multiple times near vital organs. There can simply be, in this case, no doubt, even under NOGA review, of Petitioner's intent, and certainly under AEPA, Petitioner's not entitled to relief. One of the reasons that the OCCA gave was that because Mr. Grissom's counsel argued, conceded in opening statement that this was first-degree murder, that therefore he wasn't entitled to lesser-included offense instructions. Can that ruling stand in light of our Mitchell decision? Yes, Your Honor, it can, because in Mitchell, the issue was the Court of Appeals had held that the instruction was not appropriate because he had maintained his innocence, which is different from this case where he is conceding his guilt. Well, this isn't a case where you have a guilty plea, and the Supreme Court has distinguished between concessions of counsel and concessions of the defendant, and you also have, once the Court gave the voluntary intoxication instruction, it's clear that defense counsel pivoted and argued very clearly to the jury that they could find that he couldn't form the specific intent because he was so drunk. I mean, under those circumstances, isn't the OCCA's decision unreasonable? It's not, Your Honor, because what we have to do is we have to look for an on-point holding or something akin to an on-point holding from the Supreme Court. And in Baviano, the Supreme Court held that a defendant can waive his right to lesser-offense instructions. Well, that was the statute of limitations, that he refused to waive it, right? Correct. And it was the defendant who refused to waive it, as opposed to counsel making a concession and opening statement. Well, here, Petitioner fully agreed with that on the record that he agreed with counsel's strategy, and he said that he did. And that probably came after the voir dire in which counsel repeatedly said, you will find my client guilty of first-degree premeditated murder. And so when Petitioner said, yes, I agree with counsel's strategy, he knew full well what that strategy entailed. And again, recall for us, when did the defendant say that he agreed with that strategy? At what point? That was, I believe I have that, and I can tell you exactly which volume it is. It's volume four of the transcript. So it's during first-stage proceedings, but after voir dire. After voir dire, but before any witnesses called? I believe that, Your Honor, there were witnesses called before that. Okay. But I'm not sure I don't. We can check. We can check. We have then, even after, because I know the voir dire, you really have continuous statements by counsel regarding his client's guilt and premeditation. But that continued, did it not, during the trial? It did, Your Honor. An opening statement in first stage. Right. It sounded like a second-stage opening statement. Right. He told Petitioner's entire life story, talking about his difficult birth all the way through his life, and said that they were not going to make excuses. And so that was his strategy throughout. Now, what Petitioner points to is his closing argument in first stage, which was two-and-a-half pages, and started with, we accept responsibility, and ended with, we'll accept your verdict. Now, in the meantime, he did try to take advantage of the serendipity of getting this instruction, and he said, you know, watch the video, read your instructions. They require you to look at all the external circumstances surrounding the homicide, and you have this voluntary intoxication instruction. But what he did not do is try to argue that Petitioner was so intoxicated that he could not form the intent to kill. Well, yes, he did. He said, I want you to think about if that person that you watch on the video was capable of forming this specific criminal intent because of intoxication. That sounds like an argument that he couldn't form the specific intent. It sounds like he's hinting at that possibility. But he certainly didn't marshal the evidence for that. He didn't present that in cross-examination. The only witnesses that he called, he was setting up his second-stage defense. He started doing that at voir dire, and he was consistent with that all through first stage. And the reason that that was a reasonable strategy is the record of the cases from this court and the Court of Criminal Appeals very, very consistently hold that So we have to look at this from counsel's perspective at the time of the trial. And going into this trial, counsel knew that he did not have a viable voluntary intoxication defense here. Now, once the trial court gave that instruction... Well, and the OCCA also held, as I read their opinion, that the trial judge never should have given a sua sponte involuntary intoxication instruction because the defendant was never entitled to it. Correct. And you agree with that? That was their... Yes, I do. This case, this court and John Grant had a somewhat similar argument where the petitioner said, well, but the jury was given an indemnity instruction and this court said that the trial court was being generous. And I think that's what happened in this case as well. As I stated, this proposition as a whole boils down to intent and the evidence of intent here is simply overwhelming. If the court doesn't have any further questions. I have one question. At the tail end of your brief, you made an interesting argument, and that is on the lesser-included offense, it really doesn't even matter. Really everything that you've talked about so far, because the judge also instructed the jury in the alternative on felony murder. And for felony murder, of course, you don't need an intent to kill. You need an intent to commit an underlying offense. And you argued, and it was just, I think, three or four sentences, but it was an intriguing argument to make, that he had confessed to police that he had intended to burglarize Ms. Cobb's home. Now, how do you, and so I want you to elaborate a little bit on that argument, because one thing that I'm having trouble understanding is how does that interrelate to this overarching issue that he was intoxicated. I don't think it was any question that he was intoxicated. And so how does that, does the fact that he was intoxicated or that he had organic brain injury, would that affect your alternative argument that since he had confessed an intent to burglarize the home, that really everything else really doesn't even matter? Well, because although he probably was intoxicated, he has to be so intoxicated that he is incapable, utterly impossible, that he could have formed a specific intent. And that doesn't, the law doesn't say he couldn't have formed the intent to kill. It says he couldn't have formed whatever intent is necessary for the crime that he's charged with. And so where he was charged with, in the alternative, intending to kill people or killing people while committing an intended burglary, and he confesses that he intended to kill, therefore he obviously was capable of forming that intent in his mind. He admits that that was what he intended. Where we have that, how could a jury find that he was somehow so intoxicated that he was unable to form the intent to kill, but not so much that he was able to form the intent to steal? But wouldn't it all be the same? In other words, if the petitioner is correct that he was so intoxicated or that he was so influenced by the organic brain injury that, well, I guess that's a different issue, that's phase two, forget that. But if he was so intoxicated that he didn't have the intent to kill, wouldn't that also logically lead to the conclusion that he lacked the intent, a viable intent to commit burglary? Yes, and I think the opposite is true, which is why his confession is so important, that if he had the intent to steal and he was able to form that, then he must have also been able to form the intent to kill. And since he admitted that his intention was to steal, it follows that he was capable of forming that intention, therefore it follows that he must have been capable of forming the intent to kill as well. Thank you. But the felony murder instruction wouldn't satisfy Beck, would it? No. Because it's not a lesser included. Correct. Right, okay. So if there's a Beck error, then that's structural error, right? That Beck error cannot be harmless, yes, that's correct. But how do we get to Beck in this case? Do we? I don't think you can, Your Honor. And I started by arguing that it was inadequately briefed to begin with, and that petitioner points only to state law and not to federal law, and then you have the fact that there was no request, and then you have the fact that the evidence did not justify the giving of any lesser instructions. Right. Particularly after we have admissions of counsel, which we think were adopted by the defendant to say that premeditated murder was intended. With or without those, yes. On that basis or alternatively just looking at the facts, whether a rational jury could acquit of first-degree murder and can they excuse me of one of the underlying offenses either way. Okay, it looks like I have 4 minutes and 44 seconds here. One of the things that I needed to point out that I didn't was about the two kinds of brain damage. We believe that his brain damage helps explain this disorganized crime. But it's not a requirement to have that nexus to the crime. We have both. It's extremely helpful to show this disorganized crime. Now, in Donald Grant's case, I'm going to differentiate that really quickly. As far as in Donald Grant, they had a list of mitigators. Brain damage was talked about. I'm going to also point out that the fact that the jury knew that Rundle Griffin was depressed does not equate with physical alteration of the brain structure. It's not the same thing. I think it's really important to note, speaking of what happened in Little John 2, the kind of qualifiers that were added on. One was it matters the severity of the brain damage. The other was about the treatability. Dr. Hall was really good on the fact that Rundle Griffin did really well, very well, she said, in a structured environment. It's kind of like an intellectually disabled client that we have. They do great in the prison setting, the concrete brain. But that's not Dr. McGarrahan's diagnosis of dementia, which she basically says is not treatable. Dr. McGarrahan probably could have said the same thing, but Dr. Hall already said it. There was no need for McGarrahan to talk about how well Rundle Griffin did. There would have been even greater evidence of how well he did, how well he does in prison. Kind of like our intellectually disabled clients. I like to talk about brain damage, not dementia, the dementia label, the diagnosis. But dementia, that onset, that early in his life, he was only 37 years old. One of the ways that I thought was interesting, a 37-year-old that could not remember what his age was, first he said 37, and they thought him in it. And I do that, too. Right, be careful. But then it's a 37-year-old, not like us. Some can argue that you can judicially notice that all three of us look the same. The way he paused and then he went, no, he went back, no, I am 37. But at the same time, he rattled off his phone number, his parents' address. That's one of the things that I think is, there's so much evidence on both sides. That's why a trial judge, he had discretion. He actually had the discretion to make this decision. I'm going to instruct on intoxication. So many times the OCA says, oh, they didn't abuse their discretion. In this case, they come on, oh, he did abuse his discretion. He had the discretion. Do we have a problem here in this case with counsel admitting guilt on behalf of the defendant? Has the defendant now recanted his guilt? Are we on to that phase here? I think that as far as Lyndall Grissom personally, he said, I accept responsibility. He didn't say his guilt. I talked about it in the reply brief. All the presumptions and burdens and benefits that clients have in our jurisprudence, the trial judge and everybody talked about it, the presumption of innocence, the burden that the prosecution had. This was a real trial. Guilt was not admitted. I thought it was several times by counsel on behalf of the defendant. Are we still arguing about that? Well, it doesn't – the fact that counsel at the beginning of the trial was saying, you know, essentially I take responsibility, he did it, those type of statements does not take away the presumption of innocence and the burden of proof that the prosecution had. All through, yes. All through the trial. So real quick on the Beck. I like what you had to say about Beck and John Grant, but unfortunately that's an en bas question. But if you look more at why Cooks decided, and the Supreme Court decided, that Beck applies even when there's a non-automatic death penalty, if you really look deeply at that, it shows why unreliability applies in this case. The distorting effect, you know, the jury, especially with that note about Simbolton, they had these doubts. Second-degree murder might have been very appealing to them, but the distorting effect, the sensing stage wasn't the place to fix it. I'm out of time. I don't know if you want me to have any further questions. Judge Beck always has one more. Go ahead. You can tell how excited she is to give you permission. Before the heat rages, I want to ask you, because I don't know that you did address it, and I'm not faulting you, in your reply brief to the little argument that I was asking Miss Crabb about at the tail end of her argument, because I'm interested in your perspective on it. Now, by way of a prelude to that question, as I understand her argument is that, well, for felony murder, you don't have to have an intent to kill, so it didn't matter if he was so intoxicated that it would have vitiated an intent to kill, but he had conceded to the police that he had an intent to burglarize, and nowhere, and certainly in your fellow briefs, and I don't think in the OCCA, certainly, have you questioned whether or not he had an intent to commit burglary. And so without an argument from you, and if there is no lesser-included offense under spaziato, that would have been permissible, that would have been applicable. Have you, in effect, waived your argument on ineffective assistance of counsel for a lesser-included offense by failing to question what she said on the second-to-last page of her brief? We did talk about the lesser-included offense, the lesser-included offense for burglary, felony murder, and we also, you know, Well, okay, and I'm not, I'm sorry to interrupt you, but I don't want you to lose your train of thought, but my memory was, I didn't really understand it in the context that you presented that in your opening brief, because you were saying, well, yeah, the judge screwed up in all these other ways. Well, I was reading it, and I was thinking, well, yeah, he's not really questioning any of these other offenses that he was convicted of. He's concerned about the death penalty. Right, and that, and that, there's a lot to be said about this. I'll try to say it really quick. You know, as a general verdict, you don't know which, which mouse of forethought or felony murder. The trial counsel asked for a specified verdict and didn't get it. All this evidence, all the testimony, there was a lot of leading questions to this very drunk guy, and with the alcohol and the cymbalta, you know, all these questions. He didn't know what was in his mind. He had no idea what was in my head through all this kind of, he didn't, as far as the intent, the specific intent, the evidence is, man, he was so drunk, he didn't have any specific intent. You know, what was in my mind? What was I thinking? I don't know how. I didn't intend for any of this to happen. It speaks to the specific intent of burglary, and I believe there was leading questions. He, I think he thought that maybe Jesse John got the gloves. I mean, you have to look at that, but there was a lot of leading questions that led him into, you know, whatever drunken type of, you know, semi-admissions there were about burglary, but I believe that the specific intent was in question. Thank you. Okay, we have one more question. With regard to the Cymbalta, try as I might, I couldn't find any evidence in the record that Cymbalta exacerbates the intoxicating effects of alcohol, and then looking at the, just the information put out on the drug, it actually says that it does not, and the reason they recommend you don't take it with alcohol is because it will cause liver damage. Did the defender have any obligation to put in some evidence that the Cymbalta really actually exacerbates intoxication? As far as what was before the state courts, all we have is Wendell Grissom drunkenly wondering about it, honestly, is all that there is. You know, in our federal habeas, we've got more. We have an expert, Dr. Light, that talks about it. That's where that is. But that was the jury. If you look at that journal, they were worried about it. They wondered about it. And Judge Franklin had an instruction about Cymbalta. So it was on everybody's minds. All right. Thank you. Thank you. Thank you both for your arguments this morning. The case is submitted. Thank you. Thank you. Court is now at recess until 930 on July 27th.